UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:12-CV-00053

CHRISTOPHER S. KELTER                                                                           Plaintiff,

v.

WASP, INC., a Minnesota Corporation,
a/k/a WATKINS AIRCRAFT SUPPORT PRODUCTS, *et al.*                                Defendants.

**MEMORANDUM OPINION**

This matter is before the Court upon the Renewed Motion for Summary Judgment of Crossclaim Defendant Designed Conveyor Systems, Inc. ("DCS"). (Docket No. 145). Crossclaim Plaintiff Conken Systems, Inc. ("Conken") has responded, (Docket No. 149), and DCS has replied, (Docket No. 150). Fully briefed, this matter is ripe for adjudication. For the reasons set forth below, DCS's Motion will be GRANTED.

**Factual Background**

Plaintiff Christopher S. Kelter worked as a package handler at the Paducah, Kentucky, FedEx Ground Package System, Inc. ("FedEx") facility. On April 7, 2011, Kelter worked the "inbound" shift, requiring him to unload packages from tractor trailers and distribute them onto delivery trucks using conveyor belts. Kelter attempted to clear an obstructed package, but tripped and fell while walking across the moving conveyor belt. His arm was pinned between two rollers located near the P-12 hitch area.[1] The resultant traumatic injury ultimately led to the amputation of Kelter's lower right arm.

Conken manufactured the machinery at issue, known as a "material handling sortation system." As Conken has explained, "This system is a series of conveyors, chutes, and tables used for sorting

---

[1] Conken explains that a hitch is "a conveyor component that allows changes in the slope of a conveyor system. The P-12 hitch changes elevation from a level conveyor to one going 'uphill.'" (Docket No. 111-1 at 4-5.)

1

inbound and outbound packages for delivery to FedEx Ground customers in Paducah and beyond." (Docket No. 111-1 at 1.) After Conken won the FedEx job through a competitive bidding process, it subcontracted with DCS to manufacture the conveyor components and produce AutoCAD drawings for the Paducah facility. Specifically, DCS designed and manufactured various component parts and tailored the project's specifications to the size constraints of the Paducah facility. (Docket No. 149 at 2.) DCS relied solely upon FedEx's specifications and made no attempt to alter or improve the system. (Docket No. 145-1 at 2.)[2] DCS's involvement ceased once it shipped the component parts to FedEx; the company installed no part of the conveyor system. (Docket No. 145-2 at 3.)

Kelter's claims against DCS were dismissed as time-barred in the Court's Order of March 11, 2014. (Docket No. 118.) However, Conken has asserted a crossclaim for common law indemnity and contribution from DCS for any damages that it may be required to remit to Kelter. (Docket No. 47.) In the instant Motion, DCS disputes any obligation to indemnify Conken. (Docket No. 145.) Conken responds that should a jury accede to Kelter's contention that the system was negligently designed, Conken is indeed entitled to indemnity by DCS as the designer of the component parts. (Docket No. 149 at 1.)

**Legal Standard**

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing

---

[2] It is undisputed that the specifications provided by FedEx did not require a guard at the system's P-12 section, where Kelter was injured.

the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

## Analysis

### I. Common law indemnity

Indemnity "is simply the repayment to one party by another party who caused the loss, of such amounts the first party was compelled to pay." *Liberty Mut. Ins. Co. v. Louisville & Nashville R.R. Co.*, 455 S.W.2d 537, 541 (Ky. 1970). Unlike the statutory creations of apportionment and contribution, the right to indemnity is born of the common law and "is available to one exposed to liability because of the wrongful act of another with whom he/she is not *in pari delicto*." *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 780 (Ky. 2000). "Under Kentucky law, cases permitting recovery based on indemnity principles 'are exceptions to the general rule, and are based on principles of equity.'" *Hengel v. Buffalo Wild Wings, Inc.*, 2013 WL 3973167 at *2 (E.D. Ky. July 31, 2013) (quoting *Hall v. MLS Nat. Med. Evaluations, Inc.*, 2007 WL 1385943, at *3 (E.D. Ky. May 8, 2007) (internal quotation marks and citations omitted)).

The "indemnity exception" applies in two classes of cases:

> (1) Where the party claiming indemnity has not been guilty of any fault, except technically, or constructively, as where an innocent master was held to respond for the tort of his servant acting within the scope of his employment; or (2) where both parties have been in fault, but not in the

> same fault, towards the party injured, and the fault of the party from whom indemnity is claimed was the primary and efficient cause of the injury.

*Degner*, 27 S.W.3d at 780 (quoting *Louisville Ry. Co. v. Louisville Taxicab & Transfer Co.*, 77 S.W.2d 36, 39 (Ky. 1934)).

Here, DCS argues that Conken is not entitled to indemnity because the two companies are *in pari delicto* for Kelter's injuries that are allegedly the result of the system's defective design. DCS contends that it played no part in designing the system; all design responsibilities, DCS says, lay solely with FedEx. (Docket No. 150 at 2.) Therefore, assuming that the relevant portion of the system was a product of defective design, both DSC and Conken are at fault for erroneously relying upon FedEx's faulty specifications. (Docket No. 145 at 9.)

Conken points to *Brown Hotel Co. v. Pittsburgh Fuel Co.*, 224 S.W. 2d 165 (1949), Kentucky's seminal case explaining the right to indemnity. *Brown* provides a classic example of one defendant being entitled to indemnity from another because the first was not *in pari delcito* with the negligence alleged. When a fuel company employee left a manhole lid loose on the hotel's premises, causing injury to a pedestrian. Although the trial verdict specified that the hotel and the fuel company should each pay half of the judgment, Kentucky's highest court ultimately granted indemnity to the hotel. *Id.* at 165.

*Brown* reasoned that the fuel company employee's failure to securely cover the manhole served as the "primary, efficient and direct cause of the accident"—the "positive antecedent" that exposed the hotel to liability. *Id.* at 167. "Both were in fault but not the same fault toward the party injured. The employees of the two companies were not acting jointly or concurrently or contributory in committing the tort. They were not in pari delicto." *Id.* at 167. *Brown* articulated the governing principle of the indemnity doctrine:

> Where one of two parties does an act or creates a hazard and the other, while not concurrently joining in the act, is, nevertheless, thereby exposed to liability to the person injured, or was only technically or

4

> constructively at fault, as from the failure to perform some legal duty of inspect and remedying the hazard, the party who was the active wrongdoer or primarily negligent can be compelled to make good to the other any loss he sustained.

*Id.*

Conken argues that it shares the station of the Brown Hotel, that indemnity is appropriate under the doctrine of *respondeat superior*, and that it is not *in pari delicto* for Kelter's injuries. According to Conken, any of its own fault can only be *constructive*, not actual; Conken relied upon DCS as its agent to design a reasonably safe product. As the argument goes, the agency relationship renders any of Conken's fault for defective design ultimately attributable to DCS, because DCS was the active tortfeasor on whom Conken merely erroneously relied. (Docket No. 149 at 11-12.)

The parties' central dispute concerns whether DCS participated in the system's design, thus rendering it an active tortfeasor. Arguing in favor of this proposition, Conken points to the depositions of several DCS employees. First, Conken notes the testimony of Cheryl Morton, "Conken's primary contact at DCS." (Docket No. 149 at 3.) In an e-mail dated April 29, 2008, DCS provided a price quote for work to include engineering of the system. At deposition, Morton testified that this charge referred to DCS's providing AutoCAD drawings for the conveyor's installation. (Docket No. 149 at 3 (citing Morton Dep. at 34-35).) She further explained that no actual engineer was involved in this "engineering." (Docket No. 149 at 3 (citing Morton Dep. at 34-35).) Conken next highlights the testimony of DCS President Kenneth Wood, who explained that DCS produced CAD drawings for Conken and that this service was invoiced as "engineering."[3]

---

[3] Wood testified as follows:

> Q. And can we – well, do you think Designed Conveyor Systems provided engineering services to Conken Systems with regard to the Paducah conveyor systems – or to the Paducah conveyor belt?
>
> A. I think we produced CAD drawings. And the reason that I'm pausing is that, is engineering a value-add or did we change anything about the stuff that FedEx asked us to do, no.

5

Finally, Conken points to the deposition of DCS design engineer Zachary Casper, who testified as follows:

> Q. Have you designed any system for Federal Express, their conveyor systems?
>
> A. I wouldn't say "designed," no.
>
> Q. Have you designed any of their component parts?
>
> A. Yes.
>
> Q. What component parts have you designed for Federal Express?
>
> A. Most of what we sell, I would say. I've had involvement with most everything we sell.

(Docket No. 149 at 5 (citing Casper Dep. at 9-10).) This exchange, Conken says, makes clear that DCS participated in the design of the system's component parts. (Docket No. 140 at 13.)[4] Conken maintains that these depositions demonstrate that DCS provided engineering services for which Conken paid an additional fee, making DCS an active tortfeasor and confirming Conken's role as passive recipient. (Docket No. 149 at 13.)

---

> Q. You paused a little bit as to whether you think engineering is the right – is it adjective?
>
> A. Yes.
>
> Q. --as to describing the scope of work; is that your pause?
>
> A. That's – yes, that's the pause.
>
> Q. But, obviously, we can agree that at least one of your employees considered engineering to be the right word in invoicing and the emails, correct?
>
> A. I think that's correct. I think as we've been working with FedEx and many others through a lot of years, FedEx, in the invoicing process and in the spec process doesn't make a distinction between engineering work and CAD work that's required to get it done. I think collectively, it's probably viewed as engineering.

(Docket No. 149 at 4 (citing Wood Dep. at 21-22).)

[4] DCS contests Conken's characterization of Casper's testimony, arguing that Casper did not admit to designing component parts, but only to having "some involvement" in most everything sold by DCS. (Docket No. 150 at 2.)

DCS protests Conken's characterization of the two companies. DCS argues that neither Conken nor DCS played any role in designing the P-12 hitch, leaving both companies subject to FedEx's specifications with no discretion to deviate from them. Given their equal positions, DCS says, Conken and DCS are *in pari delitcto*, and indemnity cannot apply.

DCS relies upon portions of the same employees' testimony, first pointing to Cheryl Morton's claim that DCS neither designed nor had design input regarding the Paducah facility. (Docket No. 150 at 2 (citing Morton Dep. at 19).) Ken Wood's testimony confirmed that DCS has never designed an S-hitch, the part at the P-12 location that arguably caused Kelter's injury. (Docket No. 15- at 2-3 (citing Wood Dep. at 12, 22, 27).) DCS finally relies upon the testimony of Trey Curtain, who stated that FedEx provided a design to the contractor and expected the designer to abide by the provided specifications. (Docket No. 150 at 3 (citing Curtain Dep. at 22:48-49.) The parties agree that according to Curtain, FedEx maintained "complete control over the creation and modification of the material handling sortation system design." (Docket No. 150 at 4; Docket No. 148-1 at 4.)

DCS also offers the testimony of Tom Conneff, owner of Conken, who testified that he expected DCS to satisfy FedEx's specifications:

> [W]e depend on our suppliers to meet the FedEx spec that we supply and install. I go through and make sure it fits in and that the pieces and parts are all correct. . . . I have conversations with the manufacturers to make sure we are meeting the FedEx spec and to make sure that we are meeting any other applicable specs or requirements to make it safe.

(Docket No. 150 at 4) (citing Conneff Dep. at 53, 71).)

Finally, DCS contends that Conken was no passive recipient of DCS's work, as Conken's agreement with FedEx required Conken to "take all reasonable steps including, but not limited to, inquiry into criminal history, work history, references, and educational history required to properly screen its employees and/or subcontractors." (Docket No. 145-8 at 14.) DCS therefore argues that Conken assumed responsibility for DCS's credentials. (Docket No. 150 at 6.)

7

As stated above, at the summary judgment stage, the Court must view all facts in the light most favorable to the non-moving party. Fed. R. Civ. P. 56. Here, two competing versions of DCS's role in the system's design and production exist. The Court need not resolve this factual dispute at the summary judgment stage, as the differing contentions present determinations that the Court cannot make at this point. Genuine issues of material fact that remain for trial—namely, whether DCS participated in the product's design. Therefore, the Court finds summary judgment inappropriate on this basis.

## II.     Contractual indemnity

DCS next argues that even if Conken were entitled to indemnity from DCS, such indemnification "would simply be a wash," because Conken is contractually obligated to indemnify DCS. (Docket No. 145-1 at 10.) The interpretation of a contract is a question of law for the court. *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992). Where there is no ambiguity, Kentucky courts will enforce a written instrument strictly according to its terms and will assign those terms their ordinary meaning. *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). Conken does not contend that the contract is unambiguous, nor does the Court perceive a lack of clarity in its language. The contract provides, in relevant part:

> Reseller [Conken] will indemnify and hold harmless DCS, its agents and employees, from and against any and all third party claims, suits, losses, and expenses, including reasonable attorneys' fees and litigation costs, arising from injury to person or property (excluding loss of use thereof), arising from: (a) negligent actions or omissions of [Conken], its agents or employees, (b) modifications to the products or equipment purchased from DCS by [Conken] or others, or (c) *negligent installation (including safety labeling), maintenance or operation of the products or equipment purchased from DCS.*

(Docket No. 97-4 at 2) (emphasis added).

Both Conken and DCS agree that Kelter's injuries resulted from improper or negligent operation of the system—that is, his walking upon a moving conveyor belt, contrary to numerous trainings and warnings instructing otherwise. (Docket No. 145-1 at 11.) Assuming that such alleged negligence caused

8

Kelter's injury, the accident plainly falls under the contract's indemnity provision. Although Conken argues to the contrary, it does not appear that the actionable negligence need be ascribed to Conken, but may instead be attributable to *any* "negligent installation . . . maintenance or operation of the products or equipment purchased from DCS." (Docket No. 97-4 at 2.)

Because the Court cannot reference extrinsic facts or aids to determine the meaning of an unambiguous instrument, *Frear*, 103 S.W.3d at 106, it need not provide additional explanation for its conclusion. However, even were such extrinsic items admissible, they nevertheless would not alter the outcome.

Conken argues that the contract, dated January 18, 2006, does not apply to the transaction at hand. Instead, Conken points to an e-mailed proposal for sale of mechanical equipment and a breakdown of total costs. (Docket Nos. 182-1, 182-2.) However, these messages do not appear to supplant the terms of the original contract between the companies. Moreover, Section 14 of the contract provides that the agreement will be automatically renewed on an annual basis unless expressly terminated. (*See* Docket No. 97-4 at 3.) Conken does not argue that either party terminated the contract; thus, its terms—including the indemnity provision—remained in effect throughout the relevant period.

Finally, the Court notes that although this issue arose briefly in the deposition of Kenneth Wood, president of DCS, Mr. Wood's testimony is far from conclusive. When asked if the contract related to engineering services or AutoCAD drawings—presumably as opposed to only the sale of equipment—Wood first answered, "That, I can't answer. I don't know if that's contemplated in that contract." (Docket No. 113-13 at 40:13-14.) After reviewing the contract, Wood revisited his answer:

> Q. As president of DCS, does this contract in any way relate to engineering or AutoCAD services provided to Conken Systems?
>
> A. It doesn't look like it does.

(Docket No. 113-13 at 41:18-21.) However, there is no indication that Mr. Wood participated in the drafting of the contract, nor does his interpretation of it govern the Court's analysis. Accordingly, Mr. Wood's purported concession would carry little weight were extrinsic evidence available.

The Court therefore finds that the plain language of the contract requires Conken to indemnify DCS for Kelter's alleged negligence. Given Conken's obligation, logic dictates that Conken cannot seek indemnification from DCS. Accordingly, Conken is not entitled to the indemnification it seeks, and DCS's Motion will be granted.

## CONCLUSION

For the foregoing reasons, the Court will GRANT DCS's Renewed Motion for Summary Judgment. (Docket No. 145). A separate Order will issue concurrently with this opinion.